UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| v. | ) | Criminal No. 3:25-cr-30027-MGM |
| | ) | |
| CHRISTINE GENDRON, | ) | |
| | ) | |
| Defendant | ) | |

**GOVERNMENT'S SENTENCING MEMORANDUM FOR DEFENDANT CHRISTINE GENDRON**

*"They have caused significant negative impacts on many in Springfield, beyond the banks and lenders named as victims. Their actions have left many downtown buildings vacant, abandoned, and in worsening disrepair over many years, resulting in substantial loss of value, increases in rehabilitation costs, and ultimately, a worsening economic picture for Springfield's downtown."*

Erica Swallow
President, Springfield Preservation Trust

Fourteen fraudulent loans seeking more than sixty million dollars in funds and resulting in more than eighteen million dollars of loss. Dozens of false financial records including phony rent rolls and inflated profit and loss statements. Scores of forged lease documents bearing the fake signatures of doctors, lawyers, and business operators.

Because the defendant – over an approximately four year period between 2016 and 2019 – took part in a staggering series of repeated, flagrant, and escalating frauds, the Government recommends that the Court sentence her to 45 months of imprisonment, 36 months of supervised release, restitution of $392,607 pursuant to 18 U.S.C. § 3664(h), and forfeiture of $392,607 (which the Government agrees is satisfied through the forfeiture of a substitute asset, 166 Hillcrest Avenue, Longmeadow, MA ("166 Hillcrest Avenue")), and a $100 special assessment.

The requested sentence reflects the seriousness of her offense, promotes respect for the law, provides just punishment for her crime, affords adequate deterrence for others, and protects the public from her further crimes. 18 U.S.C. § 3553(a)(2)(A)-(C).

1. Introduction

On June 13, 2025, the defendant pleaded guilty, pursuant to a written Plea Agreement with an agreed-upon Statement of Facts, to Count One (Conspiracy to Commit Bank Fraud in violation of 18 U.S.C. § 1349) of the Information. Presentence Investigation Report dated June 9, 2026 ("PSR"), ¶ 3. The Probation Department has correctly determined that the defendant's Advisory Sentencing Guidelines range is 46 to 57 months, based upon a Total Offense Level of 23 and a Criminal History Category of I. PSR, ¶ 227.

The United of America by and through Leah B. Foley, United States Attorney and Caroline Merck and Steven H. Breslow, Assistant United States Attorneys, recommends that the defendant be sentenced as follows: 45 months of imprisonment; 36 months of supervised release; restitution of $392,607; and forfeiture of $166 Hillcrest Avenue; and a $100 special assessment.

2. The Sentencings Of Defendant's Co-Conspirators, Louis R. Masaschi and Jeannette Norman

In *United States v. Louis R. Masaschi, et al.*, 23-CR-30014-MGM, Masaschi (the defendant's brother-in-law) and Jeannette Norman (Masaschi's wife and the defendant's sister) pleaded guilty to related offenses. *Id.*, D.4, 104, and 126.

On July 22, 2026, the Court sentenced Masaschi to 48 months of incarceration, 36 months of supervised release, restitution of $18,203,030, and forfeiture of $18,203,030. *Id.*, D.172.

After the Government filed a motion to find Norman in breach of her plea agreement and to release the Government from its obligations under that plea agreement, the Court continued

Norman's sentencing *sine die*, and scheduled a motion hearing on for August 11, 2026. *Id.*, D. 165, 167, 168.

3. The Defendant Merits The Recommended Guidelines Sentence

a. Legal Principles

As the Supreme Court explained in *Gall v. United States*, 128 S. Ct. 586, 596-97 (2007), the district court should begin all sentencing proceedings by correctly calculating the applicable Guidelines range, and then consider all of the factors in 18 U.S.C. § 3553(a) to determine whether they support the sentence requested. The district court may not presume that the Guidelines range is reasonable, but must make an individualized assessment based on the facts presented. *Id.* at 597.

If the district court determines that a non-Guidelines sentence is warranted, the court "must consider the extent of the deviation and ensure that the justification is sufficiently compelling to support the degree of variance." *Id.* Obviously, a major departure requires greater justification than a minor deviation. *Id.* The district court's explanation must allow for appropriate appellate review and promote the perception of a fair sentencing. *Id.*

The Guidelines "serve as the starting point for the district court's decision and anchor the court's discretion in selecting an appropriate sentence." *United States v. Molina-Martinez*, 136 S. Ct. 1338, 1349 (2016). Starting with the Guidelines' framework helps promote uniformity and fairness. *United States v. Rodriguez*, 630 F.3d 39, 41 (1st Cir. 2010). In most instances, "the Guidelines are not only the starting point . . . but also the lodestar." *Molina-Martinez*, 136 S. Ct. at 1346.

In this case, the recommended Guidelines sentence best represents the statutory sentencing goals articulated in 18 U.S.C. § 3553(a). As the Supreme Court observed in *Rita v. United States*,

127 S. Ct. 2456, 2463 (2007), the sentencing judge and the Sentencing Commission are carrying out "the same basic 3553(a) objectives, the one at retail, the other at wholesale." In other words, the Sentencing Commission's guidelines are a "rough approximation of a sentence that might achieve § 3553(a)'s objectives." *Id.* at 2465. *See Gall*, 128 S. Ct. at 596 (stating "[a]s a matter of administration and to secure nationwide consistency, the Guidelines should be the starting point and initial benchmark.").

b. <u>The Requested Sentence Reflects the Seriousness of the Defendant's Offenses and Provides Just Punishment</u>

As the Court recognized during Masaschi's sentencing hearing, the nature and circumstances of the offense are extremely serious and warrant just punishment. *See* 18 U.S.C. §§ 3553(a)(1) and 3553(a)(2)(A). As set forth in far greater detail in the agreed-upon Statement of Facts attached to the Plea Agreement, the defendant took part in a massive, multi-year bank fraud conspiracy that victimized numerous lenders, including two community credit unions, sought to gain over $60 million, and resulted in over $18 million in losses. For her work as part of this scheme, Gendron received $392,607. PSR, ¶ 10.

In this complex and sophisticated scheme,[1] the defendant, Masaschi, and Norman

[1] In the Plea Agreement, the defendant reserved the right to contest the two-level sophisticated means enhancement pursuant to USSG § 2B1.1(b)(10)(C). As the Court recognized during Masaschi's sentencing, this enhancement applies because the defendants operated a complex scheme involving multiple steps, which taken together, constituted sophisticated means that mad the scheme "more effective and difficult to thwart." *United States* v. *Ponzo*, 171 F.4th, 507, 513, (1st Cir. 2026); *United States v. Foley*, 783 F.3d 7, 25-26 (1st Cir. 2015) (holding that the defendant's use of "fraudulent" documents, "fictitious down payments," and "fake checks," taken together, constituted sophisticated means) and *United States v. Evano*, 553 F.3d 109, 113 (1st Cir. 2009) (stressing that a "scheme may be sophisticated even if the individual elements taken alone are not")). The Probation Department correctly applied this enhancement as to Gendron. PSR, ¶ 183.

methodically and repeatedly submitted a series of false documents to obtain loans for various properties owned by businesses operated by Masaschi and Norman.

First, they submitted false loan applications that overstated the income generated by the properties, which they generally offered as collateral for the loans. These applications gave lenders the false impression that the co-conspirators were operating a lucrative real estate business empire when in fact, the properties were generally losing money and unable to generate enough income to support the loan payments.

Second, they submitted false business records to support the loan applications. These records generally consisted of false rent rolls (lists of tenants with their monthly rent and expiration dates) and profit and loss statements ("P&Ls") that overstated the income generated by the properties. In one instance, they provided a fictitious, cut-and-pasted, Morgan Stanley account statement showing an account balance of $2,438,250.03 when the actual account balance was only $250.03. PSR, ¶ 28. In other instances, they provided various lenders with false financial information and documents - for example, a lease agreement with a forged signature for a non-existent company, Capital Maintenance. PSR, ¶ 49-50, 66-67, 70, 101-02, 117, 120, 122.

Third, when the lenders sought verification of the financial information in the rent rolls and P&Ls, they created and submitted a series of false loan documents - false lease agreements, lease extensions, tenant estoppel certificates, and subordination, non-disturbance, and attornment agreements ("SNDAs") - that bore the forged signatures of tenants, many of whom were doctors, lawyers, and business operators. In some instances, they submitted these documents directly to the lenders after creating them, but in other instances, they took advantage of unsuspecting mortgage brokers to distance themselves from the fraud, knowingly allowing these brokers to pass along false rent rolls and lease agreements on their behalf.

Importantly, all the victimized lenders carefully considered and relied on the accuracy of these false rent rolls and lease agreements in their loan decisions because the value of each property depended significantly on the amount of rent that its tenants could pay the owners (Masaschi and Norman and the various entities that they created to conduct their business), and thus reflected their ability to repay these loans.

This type of commercial loan fraud, specifically misrepresenting the value of rental income and tenant occupancy, misleads lenders like the victims into approving loans they otherwise would *never* normally issue based on industry practice standards. Unsurprisingly, after obtaining this ill-gotten financing, the defendant and Masaschi defaulted on the loans, sometimes after making no payments at all. This pattern of defaults left behind a trail of devastation in form of abandoned collateral properties, institutional crises, and significant financial losses.

The defendant, Masaschi, and Norman brazenly executed this lucrative scheme over and over again, moved from lender to lender, and ultimately sought an astounding total of over $60 million dollars in loans with varying levels of success. *See* PSR, ¶ 16; D. 7 (Plea Agreement), ¶ 13. In order to continue their pattern of borrowing while actively defaulting on loans, the trio operated their commercial real estate business to conceal their fraudulent activity for as long as possible. For example, rather than use a single company and bank account, they organized a network of over a dozen limited liability companies ("LLCs"), employing a different LLC and corresponding bank account for each collateral property. Additionally, rather than borrow money from a single victim institution, they strategically shifted between commercial lenders (occasionally using one commercial lender to refinance a prior loan from another lender) to prevent any single lender from growing too suspicious and identifying the fraud.

Between 2016 and 2019, the co-conspirators submitted a remarkable eighteen loan

applications, with a total loss of $20,099,295 and a total attempted loss of $60,123,000. PSR, ¶ 16. The defendant concedes that they now owe $18,203,030 in restitution but seeks apportioned restitution in the amount of $392,607. PSR ¶ 237.

The requested sentence is required "to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense," 18 U.S.C. § 3553(a)(2)(A). The defendant's conduct was serious, deliberate, and damaging. She defrauded a wide range of institutions to obtain loan packages for her family's businesses. She did this on at least eighteen occasions. Her aggregated *attempted* loan package over three years was above $60 million dollars. On two occasions, she joined her sister and brother-in-law in preying on small community credit unions that serve communities in Western Massachusetts. And to undermine the risk assessments and audits these and other financial institutions regularly undertake to protect themselves during the loan process, they forged the signatures of prominent Western Massachusetts community members, including doctors and lawyers, to cover their tracks.

The defendant made the deliberate choice to make repeated false representations to obtain funding for her family businesses. The scale of her fraud, with over $18 million in losses, is staggering. Given such conduct, a Guidelines sentence of 45 months incarceration reflects the seriousness of her offenses and provides just punishment.

c. <u>The Government's Recommended Sentence Affords Adequate General Deterrence and Protects Against Future Crimes by Gendron.</u>

Further, the requested sentence is required to afford "adequate deterrence to criminal conduct" and to "protect the public from further crimes of the defendant." 18 U.S.C. §§ 3553(a)(2)(B)-(C).

Specific deterrence is necessary to ensure that the defendant will not engage in similar

frauds in the future. Gendron is highly educated. She has advanced degrees in accounting and taxation. She is also a trained Certified Public Accountant ("CPA"). CPAs in the Commonwealth of Massachusetts must abide by the Code of Ethics and Rules of Professional Conduct (252 CMR 3.00) for CPAs and uphold core rules regarding integrity, including the duty to not knowingly misrepresent facts or subordinate her professional judgment to others. Despite this training and knowledge, Gendron willingly participated in a massive amount fraud with Masaschi and Norman in exchange for a mere $80,000/year salary from them. She now owes a significant amount of restitution to the victims in this case. Given this, there is some risk that Gendron may use fraudulent methods similar to those that gave rise to these charges to help improve her financial outlook. A term of imprisonment is, therefore, necessary to deter Gendron from engaging in future fraudulent conduct.

As this Court recognized during Masaschi's sentencing hearing, a substantial sentence for economic crimes can provide effective general deterrence. As this case makes clear, although lenders conduct underwriting, the loan process rests upon a degree of trust placed in applicants to submit true statements and legitimate supporting documents. [Here, of course, the co-conspirators circumvented even the underwriting process by submitting false lease documents with the forged signatures of tenants]. If there are no significant consequences for lying and submitting fake documents, it would potentially have severe effects on the lending industry.

As the Court heard during Masaschi's sentencing hearing, the defendant's crime victimized credit unions as well as the greater Springfield community. Credit unions are, by design and mission, often heavily focused on serving underrepresented, low-income, and marginalized communities. They are often the primary financial institutions in underserved areas, providing essential, affordable banking services where traditional banks may not operate. They are more

generous than traditional banks because they do not have shareholders. Credit unions return surplus revenue to members through lower loan rates, higher deposit yields, and fewer fees. They focus on financial wellness over profit. Frauds like this one are particularly devastating to these institutions and the communities they serve.

As Freedom Credit Union ("FCU") wrote in its Victim Impact Statement ("VIS"), the defendant's fraud "resulted in a significant loss that cannot be overlooked." FCU explained:

> These losses are resources that otherwise would have been directed toward expanding homeownership initiatives, growing small businesses, or deepening our financial education programs. Instead, we were forced to divert critical resources to address fraud and implement added safeguards to protect our members.

FCU VIS, p.1.

Similarly, as Workers Credit Union ("WCU") wrote in its VIS:

> The fraudulent activity committed by the defendant resulted in a loss exceeding $5,000,000. This loss has had a profound and far-reaching impact, not only on our institution but on the members and communities who depend on us.
>
> Because we are member-owned, this loss is not absorbed by corporate shareholders; it directly affects our members. The funds lost represent resources that would otherwise have been used to provide affordable loans, offer competitive interest rates, and maintain low fees.
>
> As a result of this fraud, our members have experienced a diminished capacity for these benefits. The financial strength of our institution has been weakened, and decisions that would otherwise prioritize member value have had to be reconsidered.

WCU VIS, p.1.

A sentence of a significant period of incarceration — 45 months — will also send an important message. It will make clear to those who work in the banking industry, business investors, white collar criminals in general, and the public at large, that this type of fraudulent

conduct will have truly meaningful consequences. Moreover, a prison term will make clear that those who carry out "white collar" crimes to obtain money will not be treated less seriously than other types of crimes that are punished with significant prison sentences.

As this Court stated in *United States v. Hanibal Tayeh*, 18-CR-3002-MGM:

> [T]here is a need for general deterrence on this type of financial crimes -- crime and a need to apply the 3553(a) sentencing factors fairly across the board for all people at all economic levels who come before this Court. People who are committing financial high level crimes who have money, who steal more money, who have businesses, who build bigger businesses, who are dealing on that upper level, are not to be accorded any type of favor that is different from people on the lowest economic rung who come before this Court with nothing. No one, no matter how financially well off, is entitled to victimize others. And this is victimization in the financial sense. There are consequences. General deterrence is a recognized factor to consider in our justice system.[2]

d. The Defendant's Personal History and Characteristics Warrant the Sentence

Lastly, there is nothing about the defendant's personal characteristics and background that warrants a sentence of less than 45 months in prison. The defendant had a relatively stable upbringing in Western Massachusetts despite losing her father at a young age. Her family worked in real estate and owned multiple properties and her mother took over building management after her father passed away. Gendron succeeded in school, obtaining multiple degrees and going on to a masters program. She worked a CPA for years before taking on a role with her brother-in-law and sister's business. She continues to do accounting work even now.

Prior to this fraud scheme, Gendron was a respectable and competent accountant. Unfortunately, she turned away from a legitimate career to veer down a path of deceit, harming buildings and institutions in her home community.

[2] Transcript of sentencing, January 14, 2025, at 54.

e. Restitution and Forfeiture

Pursuant to the Plea Agreement, the defendant has agreed to pay restitution to the victim financial institutions in this case and asks that her designated amount be prorated to the limited amount she benefited from the criminal scheme. After a lengthy conference between the defense forensic accountant and an FBI forensic accountant, Masaschi and Norman have agreed they owe a total of $18,203,030 as follows:

| Victim | Amount |
|---|---|
| Security Mutual Life Insurance Co. | $1,554,378 |
| Freedom Credit Union | $5,370,038 |
| Grand Coast Capital Fund I, LLC | $1,639,302 |
| MCREIF SubREIT, LLC, d/b/a Money360 | $ 25,000 |
| Workers Credit Union | $1,856,484 |
| Community Loan Servicing, LLC (d/b/a Silver Hill Funding, LLC) | $1,323,546 |
| New York Income Partners, LLC | $5,640,460 |
| U.S. Income Partners | $ 793,822 |

In the Plea Agreement, the Government has agreed to recommend, pursuant to 18 U.S.C. § 3664(h), that the defendant pay restitution of $392,607, which is the amount of proceeds that the defendant personally derived from the conspiracy. D.7, ¶ 4 and Statement of Facts, ¶ 3. The Government has also agreed to recommend that the defendant pay forfeiture of $392,607 and that the defendant forfeit her ownership of 166 Hillcrest Avenue, which Norman transferred to the defendant to shield it from creditors, as a substitute asset. *Id.*, ¶¶ 4, 6 and Statement of Facts, ¶¶ 222-224.

f. Avoiding Unwarranted Sentencing Disparity

Each defendant who appears before the Court for sentencing brings his or her own unique circumstances based on the nature of the crime committed and his or her own personal history. And because the statutory sentencing framework provides for the consideration of those unique circumstances in each case, *see* 18 U.S.C. § 3553(a), it is inherently difficult to directly compare sentences received by different defendants.

In the case of Masaschi (who supervised and directed Gendron), the Government recommended a sentence of 63 months - *i.e.*, 18 months longer than the recommended sentence for the defendant and this Court imposed a sentence of 48 months. *United States v. Louis R. Masaschi*, D.148, 172. Notably, unlike Masaschi, the defendant lied to FBI agents about the scheme, thereby obstructing justice. D.7, Statement of Facts, ¶¶ 225-226.

The Government's recommended sentence is greater than the Judiciary Sentencing Information ("JSIN") data compiled by the Probation Department. During 2021-2025, there were 256 defendants whose primary guideline was §2B1.1, with a Final Offense Level of 23 and a Criminal History Category of I, after excluding defendants who received a §5K1.1 substantial assistance departure. For the 234 defendants (91%) who received a sentence of imprisonment in whole or in part, the average length of imprisonment imposed was 36 months and the median length of imprisonment imposed was 38 months. For all 256 defendants in the cell, the average sentence imposed was 33 months and the median sentence imposed was 36 months. PSR, ¶ 241.

But the circumstances here warrant a sentence greater than the JSIN data. In this case, the amount of the loss exceeded $18 million and the attempted loss exceeded $60 million. Thus, the defendant falls at the higher end of the range for the applicable Guideline provision, which extends from $9.5 million to $25 million (U.S.S.G. §2B1.1(b)(1)(K)). Thus, a sentence above the JSIN data is warranted.

Moreover, as noted above, the defendant did not just join in for an isolated instance of fraud, but repeatedly engaged, over a period of four years, in multiple rounds of fraud to obtain funds her extended family's businesses. She and her co-conspirators made false representations to multiple institutions and brokers, submitted false documents (such as rent rolls) to back up her false representations, and then she submitted additional false documents (such as lease agreements with forged signatures) to substantiate the false documents. Thus, taking into consideration the unique circumstances of this case, consistent with 18 U.S.C. § 3553(a), a 45-month sentence is appropriate.

In addition, in the interest of avoiding any sentencing disparity, the Government has looked to other recent cases in this court involving similar fraudulent conduct. A 45-month sentence is still consistent with other defendants recently sentenced by this Court for criminal fraud given the much greater scale of the fraud here. In *United States v. Gerald Burke*, Case No. 22-cr-30011-MGM, the defendant stole only $1.4 million and the Court sentenced him to 31 months of incarceration. In *United States v. Antonio M. Strong*, Case No. 20-cr-30033-MGM, the defendant's fraud scheme caused a loss of just over $2 million and he was still sentenced to 34 months in prison. In *United States v. Roxanne Tubolino*, Docket No. No. 14-cr-30047-MGM, the defendant took over $1.5 million and was sentenced to 39 months of incarceration. In *United States v. Phillip Williams*, Case No. 19-CR-30016-MGM, the defendant defrauded five victims (and the Internal Revenue Service) of approximately $2.6 million and was sentenced to 66 months of imprisonment.

Here, the loss amount in this case is much greater than the losses in each of these recent cases. A sentence of 45 months would be suitably longer than as most of them, appropriately reflecting the exponential difference in the loss and the increase in loss amount category. In this way, a 45-month sentence here would avoid unwarranted sentencing disparity with these cases.

4. Conclusion

For the foregoing reasons, the Government respectfully requests that the Court impose a term of imprisonment of 45 months; three years of supervised release; a fine within the guidelines range, restitution of $392,607; forfeiture of 166 Hillcrest Avenue; and a $300 special assessment.

Respectfully submitted,

LEAH B. FOLEY
United States Attorney

By: /s/ Caroline Merck
CAROLINE MERCK
Assistant United States Attorney
U.S. Attorney's Office
District of Massachusetts
caroline.merck@usdoj.gov

STEVEN BRESLOW
Digitally signed by STEVEN BRESLOW
Date: 2026.07.24 14:56:00 -04'00'

By: /s/ Steven H. Breslow
STEVEN H. BRESLOW
Assistant United States Attorney
U.S. Attorney's Office
District of Massachusetts
steven.breslow@usdoj.gov

Dated: July 24, 2026

**Certificate of Service**

I hereby certify that this document will be filed by ECF and thus sent to the registered participants as identified on the Notice of Electronic Filing.

By: /s/ Steven H. Breslow
STEVEN H. BRESLOW
Assistant U.S. Attorney

Dated: July 24, 2026