**UNITED STATES DISTRICT COURT**
**DISTRICT OF MASSACHUSETTS**

*************************

**UNITED STATES OF AMERICA**

**V.** **CRIMINAL NO. 3:25-cr-30027-MGM**

**CHRISTINE GENDRON**

*****************************

**DEFENDANT'S SENTENCING MEMORANDUM AND MOTION FOR VARIANCE FROM UNITED STATES SENTENCING GUIDELINES[1]**

## *I. INTRODUCTION*

It is of course the paramount obligation of this court to impose a sentence sufficient, but not greater than necessary, to comply with the purposes set forth in 18 USC 3553 (a) (2). *See Dean v. United States*, 581 U.S. 62, 67, (2017), *Kimbrough v. United States,* 552 U.S. 85, 101 (2007). In making its determination as to what that sentence should be, the Supreme Court has instructed that the court consider all of the factors set forth by Congress in subparagraphs (a) (1) – (7) of 18 U.S.C. § 3553. *Id.* Although no longer mandatory, the Guidelines provide the starting point for determining an appropriate sentence and in fact must be considered. *Gall v. United States*, 552 U.S. 38, 49 (2007); *United States v. Martin,* 520 F.3d 87, 91 (1st Cir. 2008). The United States Probation Services has of course prepared a Presentence Investigation Report

---

[1] Hereinafter, USSG or "the Guidelines." Pursuant to USSG 1B1.11 the court must use the 2025 version of the Guidelines. The defendant notes that the 2025 version essentially eliminates the former language of departure from the guidelines.

(PSR) in which it has calculated the guidelines, and determined that Ms. Gendron is a Level 23, Category I offender. Her imprisonment range per the Guidelines is therefore 46-57 months.[2]

It is a very old maxim of criminal sentencing that "the punishment should fit the offender and not merely the crime." *Williams v. New York*, 337 U.S. 241, 247 (1949). Ms. Gendron contends that the sentence suggested by the advisory guidelines is excessive and inappropriate under all of the considerations of § 3553, and therefore moves for variance from the Guidelines.

## ***II. <u>18 USC SECTION 3553</u>***

The First Circuit has noted that a court's reasons for variance "should typically be rooted either in the nature and circumstances of the offense or the characteristics of the offender." *United States v. Flores-Gonzalez*, 46 F.4th 57, 58 (1st Cir. 2022) (quoting *United States v. Flores-Machicote*, 706 F.3d 16, 21 (1st Cir. 2013)). In light of this guidance, each of the factors that the court must consider pursuant to the mandate of § 3553 is considered *seriatim* in the pages that follow, with special emphasis on the characteristics of Ms. Gendron and the circumstances of the offense.

### ***(1) Nature and Circumstances of the Offense and History and Characteristics of the Defendant***

#### *a. <u>History and Characteristics of the Defendant</u>*

Christine Gendron *nee* Norman was born on November 24, 1963, the fourth of five children from the union of Eva and Joseph Norman, Jr. Her father worked as a builder and contractor, and her mother managed an apartment complex that her parents had built and owned.

---

[2] Counsel has filed an Objection to the Presentence Report in which *inter alia*, we contend that Ms. Gendron is a Level 18, Category I offender and that the appropriate guideline range is therefore 27-33 months.

Her oldest sibling is Marianne Norman Devine who is eight years older than Ms. Gendron. She is a homemaker who resides in Hull, MA. Ms. Gendron's sister, Elizabeth (Soticheck) is seven years her senior, is married and resides in Agawam. She is the long-time office manager for Entre Technologies in Westfield, MA. Ms. Gendron's only brother is Joe III, whose whereabouts are unknown to her. She has no relationship with her brother since he lost a substantial portion of her mother's assets in dubious real estate investments years ago. Her only younger sibling is Jeannette who is four years younger, and a codefendant in this case.

Ms. Gendron has been married twice. Her first marriage was to Michael Rice in 1987. They divorced in 2001. They had one child together, Mikayla, who is now thirty-two years old and resides with her husband, Brian Gonzalez, in Wells, Maine, where she works as a human resources consultant for the restaurant industry. Mikayla and Brian are the proud parents of Christine's first grandchild, Leo Scott Gonzalez, who was born on April 24, 2026.

Ms. Gendron married Scott Gendron in 2002. He is an SAP consultant for Deloitte. They live together in Feeding Hills. They have had no children together.[3]

*Childhood and Adolescence*

Ms. Gendron's childhood was defined by the sudden death of her father from a heart attack when she was twelve years old. She has very few memories from prior to that time. The Normans were a religious family—Roman Catholic—and attended church every Sunday. Her father was a good provider—a builder and property manager, and his death did not result in any

---

[3] Although they have no children of their own together, Ms. Gendron and her husband have been very close to their nephew "Little Louie," the son of her codefendants. He is a young man who has struggled emotionally and educationally. The loss of their relationship with him as a result of the rift with his parents has been very painful for Mr. and Mrs. Gendron. It has been exacerbated by Ms. Gendron's agreement to forfeit his home as a part of the resolution of these matters.

financial stress for the family. Ms. Gendron recalls her father as a very generous man, but a man who also had a temper that seemed to be mostly reserved for her brother, Joe III. Her paternal grandmother also lived with the family, moving in with Christine's family when her husband died, which was before Ms. Gendron was born. She stayed with the family until her own death when Ms. Gendron was in college. Ms. Gendron recalls little about her, other than that she worked at Steiger's department store in Springfield and that she was a very sad and unhappy woman.

Obviously, everything changed when Ms. Gendron's father died. Her mother was able to take over management of their properties, with the assistance of a property manager that she hired. While her mother successfully transitioned from housewife to managing the family business, it did not come without a cost. Ms. Gendron recalls that her mother was in mourning for a long time. She suffered from depression and severe anxiety that would occasionally manifest in panic attacks. She could not really be left alone. Ms. Gendron's older sisters were already off at college when their father died, and her brother was completely unhelpful. According to Ms. Gendron, as the only son of five children, her brother was treated like a king and behaved accordingly. Thus, responsibility fell to Chris to be her mother's *aide de camp*. Ms. Gendron's eldest sister Marianne says, "Chris became the caretaker for everyone. She protected Jeannette. She's the one we all call for everything."

Ms. Gendron's only younger sister, Jeannette, was just eight when her father died. Ms. Gendron took over a lot of the "mothering" that Jeannette needed, but that her mother was unable to provide due to her emotional issues. It was a role that she accepted if not happily, without complaint. She had a boyfriend throughout much of high school, was an average to

above average student, and was captain of the cheerleading squad. She did not drink, smoke, do drugs, or engage in any risky behaviors.

As a result of her role in the family, she became very close with both her mother and her baby sister, Jeannette.

*1. Educational Background*

Ms. Gendron graduated from Agawam High School with the class of 1981. By that time, she had already established her reputation in the family as "the strong one," the one that everyone else could depend on. She desperately wanted to go away for college but did not feel she could, since her absence would have left Jeannette alone with her mother. Instead, she applied and was accepted to Western New England College as a commuter student. She majored in accounting although she really didn't like it, only because her older brother who had assumed the role of family patriarch after their father's death, (at least in his mind) told her that she needed something that would produce a reliable income. She graduated with a B.A. in 1985. She later attended the University of Hartford where she received a master's degree in taxation.

*2. Employment History*

During college, Ms. Gendron worked as an office assistant at Crestview Country Club in Agawam, and later as a waitress at restaurants on Cape Cod during the summer. After she graduated from college she accepted a position with a small accounting firm in Boston: Panell, Kerr, Foster. In 1989, after she and her then-husband had moved back to Western Massachusetts, she accepted a position at Gerber Scientific in the tax department. She worked at Gerber for 26 years, mostly doing state tax returns for the many states in which Gerber had state tax liability.

At some point, Ms. Gendron began reducing her hours of employment. When she remarried in 2002, she reduced them to about 25 per week. Somewhere around 2012, her longtime boss at Gerber, who she was very fond of, left to go to another business. In 2015, Ms. Gendron applied for a job at the same company where her boss had migrated and was about get an offer from them when her sister Jeannette approached her about coming to work for her and her husband's business, JLL Realty[4]. Jeannette seemed somewhat desperate and said that they needed help in preparing tax returns and getting their books organized. Jeannette offered to match the salary that her sister had been getting at Gerber. The offer was appealing for several reasons. First, her commute to Gerber every day was 45 minutes each way. Second, Ms. Gendron and Jeannette's mother's health was declining due to her age and she needed more attention. But a large part of the appeal was the opportunity to work with Jeannette, with whom she had always felt a strong bond. She decided to accept, but before she even started, Jeannette made it clear that she would actually be working mostly with Lou. Ms. Gendron was extremely disappointed with this development, especially since over time, almost all of her work was with Lou. Jeannette handled the restaurants, which seemed to be the most financially stable of their businesses, and Ms. Gendron's only work with her would be at Jeannette's home where she would help with getting bills paid and orders filled, etc.

Ms. Gendron stopped working for JLL in the spring of 2020 partly due to COVID and partly because the work had become too chaotic. She had actually wanted to leave well before this time, but felt like she would be abandoning her sister. When the pandemic hit in the Spring of 2020, it was the perfect excuse for her to leave.

[4] JLL Realty was actually an umbrella organization for several real estate holdings, as well as a couple of restaurants that Lou and Jeannette owned.

As indicated previously, Ms. Gendron never wanted to be an accountant. She says, "I wasn't very good at it" and notes that it took her six attempts before she finally passed the examination to be a certified public accountant (CPA). In late 2021, Ms. Gendron finally decided to do what she had always wanted to do, which was to be a travel advisor. She started her own small business advising and helping people with their travel plans. She did this until the end of 2024 when she closed her business given the existence of this investigation and the inevitability of these charges.

Ms. Gendron has also worked for many years doing simple income tax returns for a small number of friends and family members.

*3. Health*

Ms. Gendron suffers from a number of medical conditions which affect her overall well-being.

- *Chronic Low Back Pain*

Ms. Gendron has severe lumbar spondylosis which is the source of persistent low back pain. An MRI done in April, 2025, and reviewed by her orthopedic surgeon in June, 2025, revealed "multiple levels of degenerative change; L5-S1 disc height severely diminished with motor changes; bilateral foraminal stenosis at L5-S1; disc bulge at L5-S1with compression of traversing nerve root on left; facet arthropathy." In July, 2025, after getting insignificant benefit from physical therapy and painkillers, she had her first epidural steroid injection at Pioneer Spine and Sport. There was no improvement in her level of pain and, in fact, it has gotten worse. She had a second injection on March 31, 2026, again with no appreciable improvement. She is being considered as a candidate for a relatively new treatment modality, the Intracept procedure. This is a minimally invasive treatment for chronic low back pain that uses radiofrequency energy to

target the basivertebral nerve, which transmits pain signals from the spine to the brain. She saw a new neurosurgeon in June 2026 who confirmed that the Intracept procedure is her only realistic option. She is trying to make a final decision as to whether to do it and if so, when.

*Migraine Headaches*

Ms. Gendron also suffers from migraine headaches. This is a chronic condition from which she has suffered all her life, but it has gotten much worse in recent years, and now includes light sensitivity. Over the years she has tried numerous medications and other strategies to minimize them. Having never gotten much lasting relief from anything she tried, she recently began seeing a neurologist. At a June 2025 appointment, she reported that she was experiencing severe headaches about three times per week, usually in the afternoon. A new medication was started in April, 2026, which once again has proven to be ineffective. Just a month ago, her physician increased the dosage of this medication in hopes of attaining some level of relief.

It is, of course, hard to imagine that the stress of first, a pending investigation and then indictment, plea and sentence is not a major factor in the aggravation of her migraines over the past two years. In fact, Ms. Gendron says that any time that she is forced to think or talk about this case, she is almost certain to have a migraine later in the day.

- *Right Thumb Osteoarthritis*

Ms. Gendron gets some relief from cortisone injections that she gets for this malady, but the positive effects eventually wear off;

- *Hyperlipidemia*

This is currently being controlled by statins;

- *Graves' disease (hyperthyroidism)*

This condition is also being controlled by medication.

*Current Life*

Ms. Gendron's life since she stopped working at JLL has been largely consumed by her devotion to her family and a couple of very close friends. She is very close to Mikayla, her only child who, as noted above, is a new mother. The attachment is mutual. Mikayla and her husband Brian are both very close to Ms. Gendron and her husband and are actively engaged in trying to get them to move to Maine so that they can be a more regular part of their (and their children's) lives. A move is probably inevitable but not imminent, if only due to Ms. Gendron's undying responsibilities to both her mother and her aunt, discussed more fully later in this memorandum.

Ms. Gendron's mother, Eva, is 93 years old and currently lives at The Agawam Nursing Home, in a memory care unit. Ms. Gendron visits her every day.

Her Aunt, Jeannette Boudry, is 89 years old and still lives in her own home, largely due to the support that she receives from Christine.

*b. <u>Nature and Circumstances of the Offense</u>*

When Ms. Gendron went to work for her brother-in-law and sister at JLL Realty, she had no background or training in commercial real estate. Despite that, she felt that she did not need to understand the business to be helpful in just getting their books organized, seeing that bills were paid and the like. She viewed her role essentially as a bookkeeper, although she did whatever was asked of her, including tidying up the bathrooms when they needed it. She had no interest in doing CPA work and did not seek compensation apropos to a CPA.

At some point during her tenure with JLL, Lou began referring to her as "financial manager." This was not a title that she ever asked for, nor did it reflect what she actually did there. She viewed the primary function of her job as little more than balancing the checkbook

and trying to bring some semblance of order to an office environment that was nothing short of absolute chaos. Much of the chaos was caused by Lou himself, who never kept receipts, or if he did, could never find them. He had the rather annoying and frustrating habit of taking checks out of the corporate checkbook and using them willy-nilly without recording to whom they were made payable or in what amounts. Ms. Gendron describes the largest part of her job as just trying to get bills paid, as there were endless written and telephonic threats to take legal action for non-payment of bills. She had no involvement whatsoever in the actual purchasing and leasing that was the core activity of the business; however, over time, Lou would ask her to create or witness documents that he needed for loan purposes. In the beginning it seemed like the business was doing well, but over time Ms. Gendron developed concerns. It seemed like Lou was always trying to get another loan. He began to ask her for help in creating the rent rolls which lenders required for a loan. Although Ms. Gendron was not privy to the leases that Lou had negotiated, she began to notice that some of the amounts that Lou told her to put into the rent rolls did not match her recollection of the rent checks that were paid to JLL. When she questioned this, he explained that "everyone does this in commercial real estate" and that it was not a problem so long as no one lost money. Other times, Mr. Masaschi would ask her to "witness" a signature that she assumed was that of a tenant who had just forgotten to have his signature witnessed when she or he signed the lease. Other documents were given to her with instructions to send them to various brokers and/or banks. She did not read these documents and often did not even understand what they were or why they were required by the bank.

***(2) The Need for the Sentence Imposed etc.***

§ 3553 (a)(2) contains several considerations that relate to the goals of sentencing, such as protection of the public, deterrence, rehabilitation, and just desserts.

*(a) Protection of the Public*

Ms. Gendron is a kind and gentle person with no history of criminal or antisocial behavior. There is no suggestion, nor could there be, that she presents any risk to the public. As noted elsewhere in this memorandum, Ms. Gendron never liked being an accountant and has no intention of ever working in that field again. She gave up her license as a CPA in 2023.

*(b) Deterrence*

Deterrence, of course, comes in two forms: general deterrence and specific deterrence. The Government will no doubt argue that there is a general deterrent effect that flows from prosecutions for fraud. That much is certainly true. But the deterrent effect stems first from the public accusation and the ruin of businesses and reputations that is part of any white-collar prosecution. While there may be an additional general deterrent effect from jailing someone, that benefit is likely ephemeral and must be balanced against the circumstances of the offense and the other considerations that pervade this memorandum.

There is no specific deterrence necessary that would make incarceration necessary. Ms. Gendron is not a danger to anyone and will gladly accept a bar to her working in any financial, accounting or bookkeeping position.

*(c) Rehabilitation*

Ms. Gendron has never had a problem with drugs, alcohol, gambling or any other addictive behavior which needs to be addressed through a process of rehabilitation.

*(d) Just Desserts*

Rather than elaborate on this point at this time, counsel asks the court to consider his conclusion to this memorandum.

***(3) Kinds of Sentences Available***

While the defendant is not statutorily eligible for a sentence of probation, she is eligible for the sentence that counsel seeks: commitment for one day to the Bureau of Prisons followed by a term of two years supervised release with conditions of restitution.[5]

***(4) and (5) The Sentencing Guidelines and Policy Statements***

As suggested at the outset of this memorandum, the defense contends that the Guidelines in this case are unnecessarily harsh because they are not fairly normed for a conspirator who did not receive any proceeds from the fraud and who was not intended to receive proceeds from the fraud. Ms. Gendron's guidelines are driven almost entirely by the provisions of USSG Section 2B1.1 (b)(1)(K) which add twenty points to her guideline score because the total loss was

[5] Counsel acknowledges that this is essentially a workaround of the language contained in 18 U.S.C. §3561 (a)(1) which prohibits a sentence of probation for a Class B felony. It is a workaround that it used widely by other judges in this District, however. *See, e.g.*, *United States v. Adriana Solano*, 24-10063 (Judge Talwani), *United States v. Gina Rogers*, 21-10288 (Judge Zobel), *United States v. Victoria Talbert*, 95-10013 (Judge Keaton). And, of course, this court has imposed the exact same sentence that counsel requests in *United States v. Pecoy*, 19-30058. The court would not actually have to order Ms. Gendron taken into custody. Pursuant to the BOP sentence computation manual (Policy Statement 5880.28) the court could give Ms. Gendron credit for one day because she appeared voluntarily and was released on conditions after processing by the United States Marshal.

slightly over $18,000,000.00. This is patently unfair to a defendant like Ms. Gendron who neither received nor was intended to receive any proceeds from the fraud.

***(6) Need to Avoid Unwarranted Sentencing Disparities***

The PSR includes statistical data from the Judicial Sentencing Information Network (JSIN). As this court knows, sentencing practices vary dramatically from region to region and even District to District within the United States. So, while these numbers may accurately reflect what is being done across the United States, they very well may not reflect what other judges are doing in this Circuit or even in this District. And they are of little value in a case like this one where the defendant neither received nor was intended to receive anything from the fraud in question. To counsel's knowledge, there is no way to know whether any of the sentences considered in the JSIN numbers were imposed on defendants who did not benefit nor were intended to benefit from the fraud involved. Stated differently, the court cannot be sure that it is comparing apples with apples as opposed to apples with oranges. *See e.g.*, *United States v. Rodriguez-Adorno*, 852 F.3d 168, 177 (1st Cir. 2017), where the First Circuit stated in a different context, "A credible claim of sentencing disparity requires that the proponent furnish the court with enough relevant information to permit a determination that he and his proposed comparators are similarly situated." (citing *United States v. Reyes-Santiago*, 804 F.3d 453, 467 (1st Cir. 2015)). That information must enable the court to "compare apples to apples." *Id.*

***(7) Need to Provide Restitution***

Restitution is certainly appropriate and is in fact mandatory in any fraud case. Ms. Gendron does not suggest otherwise. But having said that, it is clear that those who should pay

the restitution are those who benefited from the fraud, in this case Mr. Masaschi and Ms. Norman. While neither counsel nor the defendant has been privy to either of their financial statements, we strongly suspect that neither of them have any significant assets to apply towards a restitution order.[6] Nor do they likely have any assets that the Government can seek to forfeit. Ms. Gendron has agreed to forfeit the home in which her sister and brother-in-law have been living[7] and to have the proceeds from its sale applied toward her portion of the restitution. Once again, Ms. Gendron got nothing from her brother-in-law and sister for putting their home in her name.

In the process of negotiating the plea agreement in this case, counsel brought the provisions of 18 U.S.C. § 3664(h) to the attention of the United States Attorney's Office. This provision was no doubt inserted into a fairly unforgiving piece of legislation, The Mandatory Victims Restitution Act (MVRA), to account for the situation where one conspirator or other jointly responsible party has assets that the others do not but is far less culpable. But it is unlikely that the drafters could have anticipated a situation as extreme as this one—where the only person capable of paying any restitution is the person who neither got any of the proceeds of the fraud nor was intended to get anything from the fraud. As a result of this gross disparity in culpability, the Government has agreed to limit its request for forfeiture/restitution[8] from Ms.

---

[6] Counsel and Ms. Gendron only recently became aware of the trust fund which apparently belongs to Ms. Norman and which is the subject of the Government's motion to be relieved of its plea agreement do to her dissipation of it.

[7] This house has always been in Ms. Gendron's name, although her codefendants have always lived in it. She agreed to have the deed and the mortgage in her name because Mr. Masaschi's credit was so bad.

[8] Note that pursuant to Section 6 of the plea agreement that Government has agreed to seek application of any forfeiture towards restitution. The precise language is as follows: "Provided the United States Attorney's Office can make the necessary representations as set for the Asset Forfeiture Policy Manual (2025), pursuant to 28 C.F.R. Part 9, the United States Attorney's Office for the District of Massachusetts agrees to submit a restoration request to the Money

Gendron to $392,607.00, which represents every single dollar that she was paid by JLL Realty during the four years and nine months that she worked there.[9] This would be a substantial penalty that actually far exceeds a fair assessment of her complicity in this fraud. After all, the vast majority of her wages were for work that was completely legitimate and honestly earned. Ms. Gendron is not a wealthy person. She is someone who worked hard her whole life and saved her money so that when combined with her husband's savings they could have a comfortable retirement.[10]

The United States Supreme Court has recently confirmed that despite the language in the MVRA, restitution is a criminal punishment. *Ellingburg v. United States*, 607 U.S. 163 (2026). In reaching this conclusion the court noted, *inter alia*, that the MVRA itself labels restitution a "penalty" for a criminal "offense." *Id*. at 166-67. The court also referenced its earlier decisions in *Pasquantino v. United States*, 544 U.S. 349, 365 (2005) and *Paroline v. United States*, 572 U.S. 434, 456 (2014), in which the court held that the MVRA is designed "to mete out appropriate criminal punishment." *Ellingburg*, 607 U.S. at 167 (quoting *Pasquantino*, 544 U.S. at 365). Given the Court's repeated emphasis on the criminal nature of restitution and the fact that restitution must be ordered in every case *as a part of the sentence*, *see Manrique v. United States*, 581 U.S. 116, 118 (2017), the amount to be ordered should be governed by the same

Laundering and Asset Recovery Section of the Department of Justice, seeking approval for the net proceeds (after disposal and other costs) of any forfeited assets identified in this plea agreement to be restored back to the victims in this case, which may, in turn, satisfy in full or in part any restitution order.

[9] Note that this number represents *gross* earnings, not net. Also note that Ms. Gendron received no benefits from this employment such has health, disability and life insurance or retirement benefits.

[10] If the court were to impose a restitution amount of $392,607.00 it would represent approximately 84% of Ms. Gendron's 401(k) account, none of which came from her work at JLL Realty, and all of which came from her many years of employment at Gerber Scientific.

principles of parsimony that govern all other aspects of criminal sentencing under the Guidelines. This is especially appropriate given that no one will ever be able to make the banks and mortgage companies that were victims of Mr. Masaschi's perfidy anything close to completely whole. The assessed value of the property to which Ms. Gendron has agreed to forfeit and have applied toward restitution is $538,900.00. Fair market value is surely much higher.[11] In an email to counsel dated April 26, 2026, AUSA Breslow confirmed that the Government anticipated that the sale of the Hillcrest Avenue home would likely satisfy the money judgment in full.

Regardless of the agreements of counsel with regard to forfeiture and restitution, Ms. Gendron's restitution *penalty* as well as her forfeiture *penalty* must be commensurate with her culpability in the overall conspiracy in order to comply with Section 3553. The court should impose restitution in an amount not more than the net of the proceeds from the sale of the Hillcrest Avenue home.

## GROUNDS FOR VARIANCE FROM THE USSG

### ***III. THE FACT THAT MS. GENRDON DID NOT RECEIVE ANY BENEFIT FROM THE FRAUD AT ISSUE, NOR WAS SHE INTENDED TO RECEIVE ANY BENEFIT, WARRANTS A VARIANCE FROM THE GUIDELINES AND A SENTENCE OF NON-INCARCERATION***

The undisputed fact that Ms. Gendron neither profited nor was intended to profit from the fraudulently obtained bank loans in question is in and of itself strong reason to vary from the

[11] A modest mortgage remains on the property in the amount of $ 85,425.77. Zillow lists its value as $593,900.00

USSG calculations. *See United States v. Prosperi*, 686 F.3d 32, 34 (1st Cir. 2012). Nor did she intend or even anticipate any harm to the victims. *Id.* at 35.

### *IV. MS. GENDRON'S HEALTH WARRANTS A VARIANCE FROM THE GUIDELINES AND A SENTENCE OF NON-INCARCERATION*

Age and physical health may be a reason to impose a sentence below the applicable guideline range where other forms of punishment might be equally efficient and less costly than incarceration.[12] "It seems logical that being away from [her] support structure, both family and doctors, will invariably exacerbate [her] conditions." *United States v. Willis*, 322 F. Supp. 2d 76, 84 (D. Mass. 2004). It seems highly unlikely that the Bureau of Prisons will be able to place her in a facility where she will have meaningful access to the neurologist and orthopedic surgeons that have become a part of her ongoing care.

### *V. MS. GENDRON'S MOTHER AND AUNT'S DEPENDENCE ON HER WARRANTS A VARIANCE FROM THE GUIDELINES AND, IN COMBINATION WITH THE OTHER GROUNDS FOR A VARIANCE, WARRANTS A SENTENCE OF NON-INCARCERATION*

Former USSG 5H1.6 indicated that a departure based on extraordinary family circumstances was disfavored. But the 2025 version of the Guidelines has deleted this language. It is now clear that a defendant's family circumstances and responsibilities can be fairly considered by the court in determining whether a variance from the guidelines is appropriate.

Incarcerating Ms. Gendron will result in a substantial, direct and specific loss of essential caretaking for her elderly mother and aunt who are dependent on her not only to perform

[12] Note that the former language of Section 5H of the USSG which stated that the defendant's age and physical condition are "not ordinarily relevant to the determination of whether a sentence should be outside the applicable guideline range" has been deleted from the 2025 version of the Guidelines.

physical tasks for them, but in an emotional sense as well. Ms. Gendron is truly irreplaceable to her mother and aunt. Ms. Gendron has always been very close to her mother who is now 93 years old, legally blind and in hospice care at The Agawam Nursing Home. It was she, who while attending college, supported her mother when she was suffering through the worst of her depression. Since Ms. Gendron returned to the area in 1990, she has seen her all the time. She has taken her on vacations multiple times in order to include her in her family's life as much as possible, far more than any of her siblings.

Mrs. Norman is undeniably approaching the end of her life. Her vision is impaired by macular degeneration, she is hard of hearing and most recently learned that she has a blood clot in her lung which is most likely lung cancer.[13] And most importantly and most sadly, she suffers from dementia. Ms. Gendron is the primary contact for all her mother's health needs both at the nursing home where she lives, and for the hospice which regularly updates Ms. Gendron about her mother's status. When there is an issue with medication or if she falls, the facility contacts Ms. Gendron at any time of the day or night. She has been told that if they have any questions or if her mother needs a dose of morphine in the middle of the night when there are no nurses on staff, that they will have to call upon her to come and administer the medication. Fortunately, this has not happened yet.

Ms. Gendron is her mother's health care proxy, power of attorney and executrix of her will.[14] Ms. Gendron goes over the care plan every three months with the facility. She handles all of her finances. Her mother does not trust anyone else in the family to handle her

[13] Since she has opted for hospice care, the family has not had testing done to confirm whether the cause of the blood clot was in fact lung cancer. As the court may be aware, since she and the family decided to enter hospice care, the focus is on providing comfort and not on diagnosis and treatment.

[14] Her codefendant sister may also be on these documents.

finances. Ms. Gendron prepares her mother's tax returns and in conjunction with Senior Planning Services is helping with the process of getting her on Medicaid, since her funds have run out.

Ms. Gendron visits her mother every day that she is in town. She needs help even to eat, so Ms. Gendron makes a point to be there around lunchtime each day, to see that she eats. She makes sure that she drinks as much as she can as well, to stay hydrated. Her mother relies on Ms. Gendron's visits to keep her going. Her mother holds her daughter's hand firmly, tells her that she is her baby, and is sad when the daughter who has been closest to her has to go home.

There is really no one else that can do what Ms. Gendron does. Her sister Marianne does not visit regularly since she lives in the Eastern part of the state. Her brother does not visit at all. Her sisters Jeannette and Elizabeth visit somewhat regularly, but not as often as Christine. Both Elizabeth and Jeannette are employed full-time and therefore cannot take their mother to medical appointments and the like.

The aunt in question is her mother's sister, Jeannette Boudry, who is now 89 years old. Ms. Boudry never married and has no children. She suffers from a lot of the common maladies of someone her age. As is the case with Mrs. Norman, her vision is significantly impaired by macular degeneration. She can no longer drive. She is also very hard of hearing and suffers from anxiety, which is managed by daily administration of anxiolytics. Ms. Gendron takes Jeannette to all of her medical appointments, and does all her grocery shopping for her. She pays her bills because her hands shake so much that she cannot write legibly. She checks her mail regularly, especially in the winter because Ms. Boudry does not like going out in the cold. Ms. Gendron also helps her with her internet and television issues.

But the physical tasks that Ms. Gendron performs for her Aunt Jeannette are really not the most important things. Ms. Boudry is fragile and lonely, and most of her friends and acquaintances have passed away. Ms. Gendron is the only family member that calls her every day, just so that she knows she is not alone. She only trusts her niece with her finances and has nominated Ms. Gendron as her health care proxy, her power of attorney and the executrix of her will. Ms. Gendron also prepares her taxes and applies for fuel assistance and SNAP benefits for her.

Ms. Gendron contends that her responsibilities and devotion to her mother and aunt are worthy of a variant sentence. *See Prosperi*, 686 F.3d at 48(citing *Martin*, 520 F.3d at 93); *see also United States v. Scalmo*, 997 F.2d 970, 974 (1st Cir. 1993), *United States v. Lopez*, 2000 U.S. Dist. LEXIS 21139, at *3 (D. Mass. 2000).

## ***VI. THE FOURTEEN LETTERS OF SUPPORT FROM FRIENDS, FAMILY MEMBERS AND BUSINESS ASSOCIATES DEMONSTRATE THAT THIS CRIME WAS ABBERATIONAL AND THAT MS. GENDRON IS WORTHY OF LENIENCY AND A VARIANCE FROM THE GUIDELINES***

The letters of support that are attached as *Exhibits A-1 through A-14* reflect a woman of exceptional character. These letters relate an almost never-ending tale of Ms. Gendron being there when needed for all those around her.

## ***VII. MS. GENDRON'S EFFORTS TO COOPERATE SHOULD WARRANT A VARIANCE AND DEPARTURE FROM THE GUIDELINES EVEN THOUGH THE GOVERNMENT HAS DECLINED TO FILE A SECTION 5K1 MOTION***

While Ms. Gendron was in general terms aware that her sister and brother-in-law were being investigated by the FBI, it never occurred to her that she would be deemed to be involved in any wrongdoing uncovered at their businesses, until FBI agents knocked on her door on May 12, 2021. Ms. Gendron invited the agents into her home and they sat down at a kitchen table.

The agents immediately began questioning her about signatures on documents that they had with them. She terminated the interview after about twenty minutes, feeling uncomfortable with the accusatory nature of some of the questions, despite the fact that they told her she was not a target of the investigation. Just six days later, she went to the United States Attorney's office with a lawyer that she had retained to represent her.[15] She signed a proffer letter[16] and submitted to questioning from then AUSA Alex Grant, largely about documents that she and purportedly others had signed several years earlier. Significantly, she had not done any preparation with her lawyer, nor did she have a solid understanding of the purpose of her interview.[17] She does recall being told once again that she was *not* a target of the investigation. After this initial proffer, all was quiet for nearly three years, but on March 1, 2024 and April 17, 2024, Ms. Gendron once again appeared at the US Attorney's Office and was debriefed by AUSA Breslow and FBI S/A Ryan McGonigle pursuant to a proffer letter. Only after her fourth statement to the FBI did her lawyer decide that Ms. Gendron needed someone with more experience in federal criminal investigations to represent her.[18] Undersigned counsel was retained on or about May 29, 2024.

Over the course of the next several months, counsel met with Ms. Gendron on multiple occasions and reviewed a fairly voluminous amount of discovery that the Government had agreed to provide in advance of seeking an indictment. There were several conversations

---

[15] Not undersigned counsel.

[16] It appears that the proffer letter was never endorsed because she was asked to sign it again when she reappeared several years later, along with a waiver of the statute of limitations. Her lawyer told her that she had to sign these documents.

[17] She recalls very little about meeting with counsel. She feels confident that there was no discussion of legal principles, nor did her lawyer take a history from her. She recalls paying a small fee and her lawyer telling her that it would not cost anything more unless she got indicted but that there was no way she would be indicted.

[18] It is perhaps significant that anytime she had to go to a proffer session, her lawyer told her to come to the state courthouse and find him and they would walk there together.

between defense counsel and the Government in which the topic of cooperation was discussed at length. The Government took the position that Ms. Gendron had not been truthful in her previous proffers. Defense counsel vigorously contended then, as he does now, that there had been no deliberate misrepresentations. At one point during a meeting between undersigned counsel and AUSA Breslow and S/A McGonigle, undersigned counsel challenged them to point to one thing in the proffers that was false. After flipping through pages for a few seconds, either AUSA Breslow or Agent McGonigle said, "well, she was not fully forthcoming," to which counsel responded, "I never contended that she was fully forthcoming during her proffers, but she did not lie."

Ultimately counsel reluctantly concluded that another proffer was not viable, since Ms. Gendron continued to insist that she had never discussed the fraud with her sister and codefendant, Jeannette. While counsel was convinced of the truthfulness of that statement, AUSA Breslow made it abundantly clear that he would never believe that. But a review of the proffers in their entirety substantiates that Ms. Gendron did in fact cooperate to a substantial degree and would have continued to do so but for the Government's insistence that she *must have* discussed the conspiracy with her sister. She didn't. But among the things that she confirmed during her several proffer sessions that are essential to the Government's case are:

- That her sister was involved in JLL Realty and was not just a homemaker;
- That Lou had forged her signature on bank documents;
- That she did not always follow proper accounting procedures when creating financial documents for Lou;
- That she believed that some of the documents that Lou gave her for tax purposes had been altered;

- That Lou directed her to create false rent rolls;
- That JLL Realty kept two sets of books;
- That while she never saw Lou create false documents, he did ask her for tape and white-out;
- That she would put in whatever numbers Lou told her to put into the books for expenses regardless of whether he had receipts;
- That while she never directly discussed the fraudulent practices at JLL Realty with her sister, she assumed that her sister and Lou must have discussed them;
- That she was in fact the sole-owner of the home in which Lou and Jeannette resided and that the transfer to her was probably done to protect the home from creditors;
- That she created false personal financial statements for Lou and Jeannette.

Ms. Gendron never denied that she had sent out numerous emails containing inaccurate information regarding leases and tenants, and that she had done so because Lou had asked her to do it and told her that "everyone does this" in the commercial real estate business and that no one would lose any money.

Any failure to be fully forthcoming stemmed from several factors. The first is surely Ms. Gendron's reluctance to believe that her baby sister was involved in serious wrongdoing, and not wanting to be put in a position of being a witness against her. She also had difficulty believing that Lou was guilty of fraud because like all fraudsters, he is charming and convinced her that no one would get in trouble for what he was doing. But a large part of the problem stemmed from never having been fully prepared to engage in these proffer sessions by her attorney. In addition to not being adequately prepped for the factual inquiries that would arise in a proffer, she was not properly prepared legally either, as she did not get an adequate explanation of the import of the

proffer agreement that she had signed, the breadth and extent of concepts such as conspiracy, aiding and abetting, joint and several liability for restitution, and other pertinent legal concepts.

The First Circuit has consistently held that a District Court judge has the discretion under Section 3553 to consider a defendant's cooperation with the government even if the government has not filed a Section 5K1.1 motion for departure. *United States v. Coplin-Benjamin*, 79 F.4th 36, 42 (1st Cir. 2023); *United States v. Landron-Class*, 696 F.3d 62, 77 (1st Cir. 2012). This court should consider Ms. Gendron's legitimate attempts at cooperation as another ground for variance from the USSG.

## ***VIII. CONCLUSION***

The United States Supreme Court has said that in the post-mandatory guideline world in which we now operate, this court "should 'consider every convicted person as an individual and every case as a unique study in the human failings that sometimes mitigate, sometimes magnify the crime and punishment to ensue.'" *Martin*, 520 F.3d at 91 (citing *Gall*, 552 U.S. at 52); *see also Koon v. United States,* 518 U.S. 81, 113 (1996). As Justice Selya has noted, reasonableness is a "protean concept" and the boundaries of the reasonable sentencing universe are expansive. *Id.* at 92. The punishment should fit not only the crime but the offender as well. *Pepper v. United States*, 562 U.S. 476, 487 (2011). This case presents unique factors that require a unique response from this court. Ms. Gendron is clearly not an evil or corrupt person. At one point in the lengthy pre-indictment process, AUSA Breslow conceded that he had no reason to think that Ms. Gendron would be in legal difficulty had she never met her brother-in-law. No truer words have ever been spoken. This case is surely unique if for no other reason than it is clear that Ms. Gendron did not profit nor was she intended to profit from the fraud at the heart of this investigation. Her entire involvement in this conspiracy consists of simply following the

directives of her boss and brother-in-law, Mr. Masaschi, who assured her that "everyone does this." As the court is aware, at his sentencing Mr. Masaschi did what he should have done five years ago—accept full responsibility for his actions and for getting his sister-in-law, who had never been anything but kind to him, involved in this sordid affair.

As the First Circuit noted in *Prosperi*, quoting Judge Stearns, the trial judge, "I think it is very difficult at times, for those of us who are judges or prosecutors or lawyers, to put ourselves in the shoes of a person with no prior experience with the criminal justice system who finds himself or herself accused of a crime. I do not think, sometimes, we fully recognize the anguish and the penalty and the burden that persons face when called to account, [ ], for the wrong that they committed." 686 F.3d at 48. The court endorsed Judge Stearns' sentence of non-incarceration in *Prosperi,* noting that he had rejected the view that the interest in general deterrence could only be served by incarceration. *Id*. at 45. In the past year, Ms. Gendron has of course had to tell family, friends and employees that she is under indictment and facing a prison sentence for conspiracy to commit bank fraud. Echoing the quote from Judge Stearns above, we sometimes lose sight of how painful and embarrassing it is for a person of otherwise good moral character to have to own their malfeasance to family and friends. Ms. Gendron's shame was such that she avoided people for the longest time. She stopped going to her book club. She would often do her grocery shopping at out-of-town stores. Most difficult for her to admit her wrongdoing to were her two older sisters who adore her. As she puts it, "it broke my heart to have to break their hearts." She also avoided telling her lifelong best friend, Sharon Roulier, until everything became public. When she finally told her, they cried together in her car. Sharon said, "I couldn't understand why it seemed like you were pulling away from me after all these years."

"The best policy considerations can be unnecessarily cruel when applied rigidly and without exception to individual human beings. . .Some [offenders] would be destroyed by a term in prison. There are defendants for whom prison incarceration makes no sense." *United States v. Baron*, 914 F. Supp.660, 665 (D. Mass. 1995) (quoting Weinstein, *Prison Need Not Be Mandatory*, 28 No.1 Judge J. 16 (1989)). Christine Gendron is such a person. While she Gendron has clearly crossed a line into criminal behavior, she has not crossed it so far that society demands incarceration as the just desserts for her transgressions. She continues to experience not only extreme emotional distress but practical consequences of her transgression as well. She had to give up her travel business—a business that she loved and one that she waited decades before starting. She can no longer even get a credit card or open a bank account in her own name. She could not get a job doing Door Dash deliveries due to her felony conviction. Ms. Gendron and her husband love Disneyworld and they go at least once a year. She was just advised that her TSA pre-check number has been revoked. The minor humiliations seem never to end.

Counsel requests that Ms. Gendron be sentenced to a term of one day in the custody of the Bureau of Prisons, followed by supervised release for a period of two years with 200 hours community service. The defendant further requests that restitution be set at no more than the amount realized upon sale of the Hillcrest Avenue home which Ms. Gendron has agreed to forfeit, and that the amount of forfeiture be applied toward restitution.

THE DEFENDANT

By /s/ David P. Hoose
DAVID P. HOOSE, BBO#239400
STREHORN, RYAN & HOOSE
100 Main Street
Northampton, MA 01060
(413) 586-4800
(413) 582-6419 (fax)
dhoose@strhlaw.com

**CERTIFICATE OF SERVICE**

I HEREBY CERTIFY that this Sentencing Memorandum, filed through the Electronic Case Filing System, will be sent electronically to the registered participants as identified on the Notice of Electronic Filing.

/s/ David P. Hoose

David P. Hoose, Esq.